IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ZORICA STRBAC, | ) | CASE NO. 1:15-CV-01885 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT & RECOMMENDATION** |
| Defendant. | ) | |

## I.     Introduction

Plaintiff, Zorica Strbac ("Strbac"), seeks judicial review of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits under Title II of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

For the reasons set forth below, it is recommended that the final decision of the Commissioner be VACATED and REMANDED.

## II.     Procedural History

Ms. Strbac ("Strbac") applied for Disability Insurance Benefits (DIB) on December 26, 2013.  (Tr. 189-197)  Ms. Strbac's application was denied initially on April 4, 2014 (111-114) and after reconsideration on September 5, 2014.  (Tr. 120-126)  On September 20, 2014, Ms. Strbac requested an administrative hearing.  (Tr. 127-128)

The administrative hearing took place before Administrative Law Judge (ALJ) Tammy Georgian on May 27, 2015.  (Tr. 32-75)  On June 12, 2015, the ALJ issued a decision finding that Ms. Strbac was not disabled.  (Tr. 7-31)  The Appeals Council denied review, rendering the

ALJ's June 12, 2015 decision final (Tr. 1-5).

On September 15, 2015, Ms. Strbac filed an appeal of the ALJ's final decision with this court. (Doc. 1)  Defendant answered and filed the transcript of the administrative proceedings on December 2, 2015. (Docs. 13 and 14)  Plaintiff Strbac filed her brief on the merits on March 1, 2016 (Doc. 17) and Defendant filed her brief on the merits on April 14, 2016 (Doc. 18), making the matter ripe for this court's review.

**III.     Evidence**

**A.  Personal, Educational and Vocational Evidence**

Ms. Strbac was born on March 27, 1959 and was 54 years old on the date her application was filed.  (Tr. 191)  She lives with her husband and twenty-six year old son.  (Tr. 36)  She completed high school in Bosnia and came to the United States in 2000.  (Tr. 39) Ms. Strbac has past relevant work as a magazine inserter; a wax-pattern repairer; a clothing inspector; a car wash attendant; a tailor; a spot welder and a machine operator.   (Tr. 60-62)

**B.  Medical Evidence**

**1.  Medical Records Related to Physical Impairments**

The relevant medical records are summarized herein.  Ms. Strbac presented to Lake Hospital on October 11, 2012 complaining of low back and lower extremity pain.  (Tr. 289)  Ms. Strbac reported a history of low back pain and occasional bowel incontinence for at least a year. (Tr. 289)  An MRI of the lumbar spine revealed a broad-based left paramedian disc protrusion at L3-4 with facet arthropathy; small protrusion at L2-3; and moderately enlarged broad-based herniation extending from L4-5 and causing severe thecal sac compression.  (Tr. 291, 327-328) Dr. Borsellino recommended surgery but plaintiff did not want surgery so he recommended that she try a course of physical therapy.  (Tr. 289)

2

Later that week, plaintiff decided to have surgery.  On October 17, 2012, she had a L4-5 laminectomy, bilateral foramintomy and right L4-5 discectomy. (Tr. 321-322)

On November 19, 2012, plaintiff returned to the Lake Health Emergency Department reporting increased numbness in her lower extremities.  (Tr. 332)  X-rays of the lumbar spine showed degenerative joint diseases of the lumbar spine at L4-5.  (Tr. 343)  Ms. Strbac was diagnosed with lumbar radiculopathy and given a prescription for Naprosyn.  (Tr. 334)

Plaintiff completed twelve physical therapy visits following her back surgery.  (Tr. 350) The discharge summary from Lake Health Physical Therapy states that plaintiff's physical therapy goals were partially met but that she continued to have tightness in the back and numbness in her legs.  (Tr. 350)

Ms. Strbac returned to her family physician, Dr. Phillip Chiang, on August 19, 2013.  (Tr. 468)  She complained of ongoing stomach problems after eating, including gas and an urgent need to go to the bathroom.  (Tr. 468)  Dr. Chiang diagnosed irritable bowel syndrome.  (Tr. 469)

On August 29, 2013, plaintiff presented to Lake Health Emergency Department with abdominal pain and cramping.  (Tr. 386)  She was diagnosed with an acute appendicitis and was admitted for surgery.  (Tr. 399-400, 410-412)

Ms. Strbac saw Dr. Tim Nice on October 3, 2013.  (Tr. 483)  She reported that her back pain had been improving and that she had been able to return to work until a week ago when she had been in a car accident.  (Tr. 483)  Physical examination revealed a positive straight leg raise on the left, tenderness in the lumbar spine and increased paraspinal tonicity, bilaterally.  Dr. Nice ordered an MRI and prescribed Motrin.  (Tr. 483)

On October 17, 2013, plaintiff returned to Dr. Nice to review her MRI results.  (Tr. 483)

The MRI revealed left paramedian protrusion at L3-4.  (Tr. 484)  Plaintiff complained of paresthesia in both legs with severe cramping and pain in her back.  (Tr. 48)  Dr. Nice's notes indicate that he could not understand her symptoms and he ordered an EMG.  (Tr. 483)  The EMG performed on October 31, 2013 showed subacute bilateral L5 radiculopathy and borderline bilateral S1 proximal conduction.  (Tr. 492-494)

Plaintiff returned to Dr. Nice on November 19, 2013 to review the results of her EMG.  (Tr. 483)  At plaintiff's request, Dr. Nice prescribed physical therapy.  (Tr. 483)  On December 16, 2013, plaintiff returned to Dr. Nice reporting that she was feeling 50% better.  (Tr. 483)  In addition to physical therapy and the anti-inflammatories she was taking, Dr. Nice prescribed a TENS unit.  (Tr. 483)

Plaintiff saw Dr. Chiang in November 2013 complaining of continued back pain and frequent bowel movements.  (Tr. 471)  Ms. Strbac stated that she could not eat unless she was at home due to her need to go to the bathroom within thirty minutes of eating.  (Tr. 471)

Plaintiff saw Dr. Nice again on January 14, 2014.  (Tr. 483)  She reported improvement with numbness and back pain.  (Tr. 483)  However, she said that she did not think she was able to return to work.  (Tr. 483)  Dr. Nice's notes state that he thinks she might be able to return to work and that she possibly needed a work hardening program and/or training for another type of work.  (Tr. 483)  Dr. Nice referred plaintiff to a neurologist due to continued issues with her back and legs.  (Tr. 483)

Plaintiff met with neurologist, Joshua Sunshine, M.D., on February 3, 2014.  (Tr. 619)  She reported tightness in her feet and difficulty climbing steps.  (Tr. 619)  Dr. Sunshine assessed bilateral leg paresthesia and ordered an EMG of her arms and legs.  (Tr. 620)  An EMG dated February 5, 2014 was consistent with possible sensory peripheral neuropathy, supported by low

4

amplitude sensory responses. (Tr. 622-624)  Dr. Sunshine met with Ms. Strbac, reviewed the EMG results and diagnosed polyneuropathy.  (Tr. 658-659)  Dr. Sunshine's examination in July 2014 revealed decreased sensation to pinprick up to mid calves and wrists, bilaterally.  (Tr. 697-698)

On June 30, 2014, Ms. Strbac established care with Dr. Kathryn Brzozowski for plaintiff's ongoing abdominal pain, diarrhea, fatigue and extremity numbness.  (Tr. 684-685)

On August 14, 2014, Ms. Strbac met with rheumatologist, Dr. Gary Kammer, regarding possible fibromyalgia syndrome. (Tr. 786)  Dr. Kammer assessed central pain disorder which was consistent with fibromyalgia syndrome associated with depression and anxiety.  (Tr. 789)  Ms. Strbac returned August 28, 2014 with concerns regarding her medications.  Dr. Bell had recently changed her medication from Ambien to Amitriptyline without being informed that Dr. Sunshine had prescribed Nortriptyline.  (Tr. 791)  Dr. Kammer documented plaintiff's various medications and stated that he would "give more consideration as to what more pharmacologically can be done to assist this patient."  (Tr. 793)

### 2.  Medical Records Related to Mental Impairments.

In February 2012, plaintiff was referred to Premier Behavioral Health Services by her primary care physician, Dr. Chiang.  (Tr. 780)  She met with Dr. Jeffery Turell during her initial evaluation.  (Tr. 780-785)  She reported feeling depressed and withdrawn. (Tr. 780)  She reported working full time as a tailor at that time.  (Tr. 783)  Dr. Turell diagnosed major depressive disorder – moderate, and generalized anxiety disorder.  (Tr. 785)  He prescribed Trazadone, with Bupropion and Lexapro.  (Tr. 781-785)  Plaintiff returned to Dr. Turell in March reporting little help from Trazadone.  (Tr. 778-779)

On November 7, 2013, Ms. Strbac was taken to the Lake Health Emergency Department

by EMS for depression and suicidal ideation.  (Tr. 433)  According to plaintiff's son, plaintiff had been off her normal medications for two months.  (Tr. 433)  Plaintiff was admitted to the Windsor-Laurelwood Center for Behavioral Medicine until her discharge on November 14, 2013.  (Tr. 457-465)  Dr. Michael Bell, a psychiatrist from Premier Behavioral Health Services, treated Ms. Strbac during her hospitalization.  Plaintiff reported that she had difficulty with depression, suicidal ideation triggered by strained relationships and paranoia of environment. (Tr. 459)  Plaintiff reported previous psychiatric hospitalizations.  (Tr. 459, 503-530)  Her previous involuntary admissions included a state at GRN Recovery Center Crisis Stabilization Unit from August 20, 2003 to August 27, 2003 (Tr. 503, 507), an admission to Laurelwood Hospital with discharge July 28, 2005 (Tr. 519), admission to Windsor Laurelwood Hospital on October 29, 2008 (Tr. 522), and an admission to University Hospitals from March 20, 2009 to March 26, 2009 with diagnosis of Schizoaffective Disorder, Depressed. (Tr. 526)

Dr. Bell diagnosed recurrent moderate major depression.  (Tr. 458) He prescribed Cymbalta and recommended outpatient psychotherapy.  (Tr. 457-458, 460)  Plaintiff reported improvement with the Cymbalta.  (Tr. 457)  On discharge, plaintiff had a 30/30 mini-mental status examination.  (Tr. 457)  Mental status examination findings demonstrated that plaintiff's mood was euthymic and she planned to return to work in two weeks.  (Tr. 457)  She had full range affect; goal-directed thought processes; and content focused on therapy.  (Tr. 457) Plaintiff expressed that she was willing to see a psychotherapist.  (Tr. 457)

Plaintiff followed up with Dr. Bell on December 6, 2013. (Tr. 776)  Dr. Bell's mental status examination showed that plaintiff was experiencing a depressed mood, but plaintiff's behavior was cooperative; she had normal motor activity; normal speech; appropriate effect; coherent thought processes; normal thought content; denied suicidal and homicidal thoughts; and

had fair insight, judgment and impulse control.  (Tr. 776)  Dr. Bell diagnosed Bipolar II and

generalized anxiety disorder.  (Tr. 776)  Dr. Bell continued plaintiff's prescription of Cymbalta

and added Zyprexa and Ambien.  (Tr. 776)  Dr. Bell also encouraged plaintiff "to apply for

medical disability secondary to significant depression."  (Tr. 776)

Ms. Strbac treated with Dr. Bell in January, April and June 2014.  Treatment notes from

these visits show an anxious and depressed mood with little improvement reported.  Plaintiff's

diagnosis remained major depression, chronic, recurrent. (Tr. 773-775)  In January 2014, Dr.

Bell noted a "slight improvement" and that plaintiff had not attempted light therapy although she

had received a light. (Tr. 775)  Dr. Bell's notes again state that he would "support client applying

for medical disability."  (Tr. 775)  On June 8, 2014, Dr. Bell noted that plaintiff had cooperative

behavior, anxious mood and appropriate affect.  (Tr. 773)  She denied suicidal and homicidal

thoughts; had good insight; and fair judgment and impulse control. (Tr. 773)  Dr. Bell scheduled

a follow-up appointment for three months and noted again that he would "support client

disability claim."  (Tr. 773)  Dr. Bell wrote a letter on June 10, 2014 indicating that he felt that

plaintiff met the criteria for major depression, recurrent and severe.  (Tr. 631, 677) He also

completed a medical source statement related to plaintiffs' mental capacity.  (Tr. 633-634)

Plaintiff began treating with psychiatrist, Dr. Sheetal R. Joshi, on October 17, 2014.  (Tr.

770-72)  During the initial evaluation, plaintiff reported a longstanding history of "low-grade"

depression, which had worsened, as well as increased worry and anxiety. (Tr. 770-772)  She

stated that with the increased depression and stress she started to feel paranoid and hear voices.

(Tr. 770)  On examination, Dr. Joshi noted dysphoric affect and fair insight and judgment.  (Tr.

771)  He assessed Schizoaffective disorder, depressed type; Generalized anxiety disorder; and

Personality disorder, NOS. (Tr. 771-772)  He assigned a Global Assessment of Functioning

7

(GAF) score of 40. (Tr. 772)   Plaintiff's prescriptions for Cymbalta and Ambien were continued

and BuSpar was added.  (Tr. 772)  Dr. Joshi discussed counseling with plaintiff who reported

that her family was a huge support system and that she could not afford counseling.  (Tr. 772)

Plaintiff also related that she felt guilty about openly expressing emotions and did not feel that

counseling would be right for her.  (Tr. 772)

Plaintiff returned to Dr. Joshi on November 4, 2014. (Tr. 769)  Plaintiff reported that

things had not been going "the best."  (Tr. 769) She reported that she had stopped taking the

Pamelor and BuSpar because it was causing gastrointestinal upset.  (Tr. 769)  She was feeling

more depressed and was experiencing increased auditory hallucinations and delusions.  (Tr. 769)

Dr. Joshi discussed with plaintiff the importance of taking medications and adjusted her

prescriptions, adding Risperidone.  (Tr. 769)

At a follow-up visit with Dr. Joshi in December 2014, plaintiff reported that things were

"going okay."  (Tr. 813)  She reported feeling stressed and worried about a possible foreclosure

on her house but reported that Thanksgiving had been "okay."  (Tr. 813)  Dr. Joshi noted that

plaintiff had a lot of paranoia, somatic symptoms and delusions, and skepticism about

medications.  (Tr. 813)  He continued her medication regime without any "drastic" changes and

scheduled a return visit in three months.  (Tr. 813)

### C.  Opinion Evidence

#### 1.  Treating Physician – Dr. Michael Bell – June 2014

On June 10, 2014, Dr. Bell wrote a letter to "whom it may concern" stating that he

believed that Ms. Strbac met the criteria for major depression, recurrent and severe.   He further

states that he supported her application for disability.  (Tr. 631, 677)

On June 11, 2014, Dr. Bell completed a medical source statement related to plaintiffs'

8

mental capacity.  (Tr. 633-634)  In this statement, Dr. Bell opined that Ms. Strbac would rarely

be able to perform several work-related tasks including: maintaining attention and concentration

for extended periods of two hour segments; responding appropriately to changes in routine

settings; working in coordination with others without being distracted; dealing with work stress;

completing a normal workday and workweek without interruption from psychologically based

symptoms and performing at a consistent pace without an unreasonable number and length of

rest periods; performing complex tasks, behaving in an emotionally stable manner and relating

predictably in social situations.  (Tr. 677-678)

### 2.  Consulting Physician – Dr. Dorothy Bradford – March 2014

On March 27, 2014, plaintiff met with consultative examiner, Dr. Dorothy Bradford.  (Tr.

615-616) The examination revealed decreased range of motion.  Dr. Bradford assessed persistent

radicular symptoms after lumbar surgery, but stated that no activity restrictions were present.

(Tr. 615-616)

### 3.  Reviewing Psychologist – Karla Voyten, Ph.D. – February 2014

In February 2014, Karla Voyten, Ph.D., a state agency psychologist, reviewed the record

evidence.  (Tr. 82-87)  Dr. Voyten opined that plaintiff could perform jobs that did not involve

more than occasional, superficial interactions with others.  (Tr. 86)  Dr. Voyten opined that

plaintiff's ability to handle stress and pressure in the workplace would be reduced, but she could

handle the stresses of a routine, repetitive, or 3-4 step tasks.  (Tr. 87)  She also opined that

plaintiff retained the sufficient mental capacity to concentrate on, understand, and remember

routine, repetitive 3-4 step tasks with uncomplicated instructions, but would be impaired for

detailed or complex/technical instructions.  (Tr. 87)

### 4.  Reviewing Physician – Paul Morton, M.D. – April 2014

On April 4, 2014, state agency reviewing physician, Dr. Paul Morton, reviewed the record and found that Ms. Strbac's severe medically determinable impairments included: degenerative disc disease; peripheral arterial disease; inflammatory bowel disease; and affective disorder.  He opined that Ms. Strbac's abilities were limited to medium work.  (Tr. 82, 84-86)

### 5.  Reviewing Physician – Ernias Seleshi, M.D. – August 2014

On reconsideration, Ermias Seleshi, M.D., a state agency physician, reviewed the record, including Dr. Bell's opinion, in August 2014. (Tr. 100-106)  Dr. Seleshi opined that plaintiff would have moderate limitations in her ability to complete a normal work day or work week without interruptions from psychologically based symptoms.  (Tr. 105-106) He also believed she had moderate limitations in her ability to maintain attention and concentration for extended periods and in interacting socially.  (Tr. 105-106)  He noted that plaintiff "is likely to have decreased work related efficiency during period of increased depressive symptoms." (Tr. 106) He opined that plaintiff retained the capacity to perform "familiar tasks in a setting without demands for sustained high pace or productivity."  (Tr. 105)  He also opined that plaintiff could perform jobs that did not involve more than occasional, superficial interactions with others due to her history of paranoia and was best suited for tasks not requiring collaborative work or the supervision and direction of others. (Tr. 106)

### 6.  Reviewing Physician – Dr. Diane Manos – August 2014

Also on Reconsideration, Dr. Diane Manos reviewed the record on August 19, 2014 and opined that plaintiff's abilities remained at the medium work activity level.  (Tr. 102-104)

However, due to plaintiff's decreased sensation to pinprick in the bilateral upper and lower extremities, Dr. Manos limited plaintiff to frequent feeling, bilaterally and limited use of foot controls bilaterally.  (Tr. 102-103)

### D.  Testimonial Evidence

#### 1.  Plaintiff Zorica Strbac's Testimony

A hearing related to the present social security appeal was held on May 27, 2015.  (Tr. 32)  Ms. Strbac testified that she lived in Eastlake, Ohio with her husband and twenty-six year old son.  (Tr. 36)  She stated that her husband worked as a machine operator and her son was not employed.  (Tr. 37)  She testified that she received health insurance through her husband's employer, Swagelok.  (Tr. 38)  Ms. Strbac had a driver's license but did not drive on the highway because it scared her.  (Tr. 39)  She stated that she finished high school in Bosnia and came to the United States in 2000.  (Tr. 39)  She took one year of economy in college.  (Tr. 39)  She trained to decorate cakes and received on-the-job training to read blueprints.  (Tr. 40)

Since coming to the United States, Ms. Strbac testified that she has worked on different machines in factories and has done tailoring work.  (Tr. 40-41)  She stated that the parts she was required to lift at those jobs weighed approximately seven pounds.  (Tr. 41)  Ms. Strbac testified that she worked as a tailor part time from 2004 to 2007, then did factory work, then returned to tailoring from 2009 to 2013.  (Tr. 43)  In 2013, she worked for Air Power as a wax-core repairer where she was required to lift five to six pounds.  (Tr. 44)  Back in 2001 to 2003, Ms. Strbac worked at a carwash and at a factory inserting papers into magazines.  (Tr. 45)   She testified that the bundles of papers were not too heavy and she was able to lift them. (Tr. 46)  Ms. Strbac testified that she was also an inspector at ADP, a factory that made after-surgery garments.  (Tr. 46)  In 2004, she worked for another factory doing cold welding which required her to use a foot

operated machine.  (Tr. 47)   That job permitted her to stand or sit, but she sat more than she stood. (Tr. 48)

Ms. Strbac testified that she had not been able to work since her back surgery which was also when her neuropathy started.  (Tr. 49)  She was unable to eat when she worked because she had to go to the bathroom constantly due to IBS.  (Tr. 49)  She also testified that she had heard voices while she was working.  (Tr. 49)  Ms. Strbac did not always take probiotics for her IBS because of the cost.  (Tr. 50)

Ms. Strbac was taking Cymbalta for her depression.  (Tr. 51)  She testified that Cymbalta helped but that sometimes she forgot to take it. (Tr. 51)  She testified that her neurologist had also told her that Cymbalta would help with the numbness in her legs. (Tr. 51)  She testified that if she missed a dose of the Cymbalta, her depression and neuropathy were worse.  (Tr. 51) Concerning her depression, Ms. Strbac stated that she experienced crying spells but they are much better with Cymbalta. (Tr. 57)  She testified that she received "counselling" from her family for her depression and did not see a therapist or counselor.  (Tr. 51)

Ms. Strbac testified that she did not smoke. (Tr. 52)  She drank approximately a glass of alcohol every other day.  (Tr. 52)  She was taking over-the-counter primrose oil for her neuropathy, an over-the-counter product for her hair and nails, and Ibuprofen or Advil for pain. (Tr. 52)

On a typical day, Ms. Strbac testified that she could dust, do laundry, make a meal, and go grocery shopping unless she was sick.  (Tr. 53)  She also read regularly, used the computer, went for walks or meditated. (Tr. 56)  She alternated between sitting in a chair and standing up. (Tr. 56) She went to church services approximately twice a month and visited friends.  (Tr. 53) However, it was difficult for her to go places because she had gas.  (Tr. 53)

12

Ms. Strbac testified that she had pain over her whole body in her muscles.  (Tr. 54)  She had pain in her arms, neck, back and wrist. (Tr. 59)  The pain felt like needles going into her legs and head or like a knife. (Tr. 54)  She stated that the pain was especially bad in the morning. (Tr. 54)  She also believed her immune system was weakened and that a cold or virus would require her to stay in bed.  (Tr. 59)

Ms. Strbac testified that she could walk a half a mile to a mile before she would need to stop.  (Tr. 54)  She also stated that she had trouble sitting in a chair and needed to get up and move around after 10 to 45 minutes, depending on the level of pain. (Tr. 55)

When asked about the job she had previously held at a metal casting plant, Ms. Strbac testified that, because she had to go to the bathroom up to 10 times a day, she would no longer be able to do that job. (Tr. 56)  Ms. Strbac testified that a wax mold job she had held was stressful for her because of her stomach issues and numbness she experienced in her legs.  (Tr. 57)  She stated those factors made it difficult for her to concentrate at that position. (Tr. 57)  Additionally, she had to reach for parts which bothered her lower back. (Tr. 58)

### 2.  Vocational Expert's Testimony

Vocational Expert ("VE"), Thomas F. Nimberger, testified at the hearing.  (Tr. 59)  The VE considered plaintiff's past relevant work to be a magazine inserter/sorter; a core preparation/wax-pattern repairer; a clothing inspector; a car wash attendant; a tailor, alterations; a spot welder; and a machine operator.  (Tr. 61-62)  Because plaintiff's allegations of error by the ALJ do not challenge the testimony or conclusions expressed by the VE or the ALJ's treatment thereof, the undersigned has only included a brief summary of the VE's opinion testimony.

For the first hypothetical question, the VE was instructed to consider a hypothetical

13

individual with the same age, education and work experience as Ms. Strbac.  He was asked to further assume that the individual could do medium work, could frequently walk, stand and/or sit; could frequently climb ramps and stairs; could never climb ladders, ropes or scaffolds; could frequently stoop, kneel, crouch and crawl; and could perform simple, routine, and moderately complex tasks.  (Tr. 63-64)  The individual was also limited to occasional superficial interactions with others.  (Tr. 64)  The ALJ asked the VE if this hypothetical individual could perform any of the past jobs of Ms. Strbac.  (Tr. 64)

In response, the VE stated that this hypothetical individual could perform the following past jobs of Ms. Strbac:  spot welder; machine operator; inserter and wax repairer.  (Tr. 64)  He stated that such an individual could not perform the tailor or the clothing inspector positions, because of interaction with people and/or the skill level.  (Tr. 64)  Additionally, the VE opined that such an individual could also be an industrial cleaner, with 75,000 positions available nationally; a packager with 82,000 positions available nationally; and a laundry worker with 88,000 available nationally.  (Tr. 63-64)

For the second hypothetical, the ALJ asked the VE to consider a hypothetical individual that could do light work, could frequently walk, stand and/or sit, could frequently push and pull bilaterally with lower extremities; could frequently feel bilaterally with lower extremities;  could frequently climb ramps and stairs, could never climb ladders, ropes or scaffolds, could frequently stoop, kneel, crouch and crawl; would have to avoid hazards; could perform simple, routine tasks but not at a production rate pace; could have only occasional superficial interactions with others and work in an environment with only occasional changes to the work setting.  (Tr. 65)  In response, the VE stated that such a hypothetical individual could perform the spot welder and machine operator positions as well as the inserter and wax repairer positions.  (Tr. 66)

14

Additionally, the VE stated that the hypothetical individual could also perform the positions of food service worker with 92,000 positions available nationally; a mail clerk with 83,000 available nationally and an office cleaner with 85,000 available nationally.  (Tr. 66)

Plaintiff's counsel was able to secure admissions from the VE that individuals who were precluded from more than occasional interactions with others, or who were regularly 15-20 minutes late to work, or who needed a number of extra 5-7 minute restroom breaks in additional to customary morning, afternoon and lunch breaks would not likely be employable in the jobs he had indicated might be available to plaintiff.  (Tr. 68-72)  In addition, the VE admitted that if physical restrictions precluded a hypothetical individual from 'reaching in all directions' only occasionally, the person would be unable to do the wax repairer and the packaging jobs he had described.  (Tr. 73)

## IV.    Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[1]….

42 U.S.C. § 423(d)(2)(A).

---

[1] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,13 claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.R.F. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that demonstrates whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## V.    The ALJ's Decision

The ALJ issued a decision on June 12, 2015.  A summary of her findings is as follows:

1. Strbac met the insured status requirements of the Social Security Act through December 31, 2018. (Tr. 12)

2.  Strbac had not engaged in substantial gainful activity since November 8, 2013, the alleged onset date.  (Tr. 12)

3.  Strbac had the following severe impairments: lumbar degenerative disc disease status post lumbar laminectomy; affective disorders diagnosed as major depressive disorder and panic disorder.  (Tr. 12)

4.  Strbac did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 14)

5.  Strbac had the residual functional capacity ("RFC") to perform light work as defined in 20 CFR 404.1567(b) except she was unable to frequently walk, stand and/or sit; frequently push or pull with the lower extremities bilaterally; frequently climb ramps and stairs, but never climb ladders, ropes, or scaffolds; frequently stoop, kneel, crouch and crawl, and was required to avoid hazards such as unprotected heights and machinery.  She was able to perform simple, routine tasks but not at a production pace and required an environment with only occasional interactions with others and only occasional changes in the work setting.  (Tr. 16)

6.  Strbac was capable of performing past relevant work as a wax-pattern repairer and an inserter.  This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity.  (Tr. 25)

Based on these findings, the ALJ determined that Strbac had not been under a disability from November 8, 2013 through June 12, 2015 (the date of the ALJ's decision).  (Tr. 25)

## VI.  Parties' Arguments

In the present case, plaintiff filed her brief on the merits on March 1, 2016. (Doc. 17) Plaintiff argues that the ALJ violated the treating physician rule by failing to accord controlling weight to Dr. Michael Bell's opinion and for failing to provide good reasons for doing so.  (Doc. 17, pp. 11–16)

Defendant filed a brief on April 14, 2016.  (Doc. 18)  Defendant argues that the ALJ properly weighed Dr. Bell's opinion and provided good reasons for doing so in her decision. (Doc. 18, pp. 8-14)

The undersigned has reviewed the record, including those specific portions cited by the

17

parties, considered the parties' arguments, and applied the applicable legal standards.  Based
upon that analysis, a recommendation to VACATE the decision of the Commissioner and to
REMAND the matter for further proceedings is set forth below.

## VII.    Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the
record to support the ALJ's findings of fact and whether the correct legal standards were applied.
*See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed
if the administrative law judge's findings and inferences are reasonably drawn from the record or
supported by substantial evidence, even if that evidence could support a contrary decision.");
*Kinsella v. Schweiker,* 708 F.2d  1058, 1059 (6th Cir. 1983).  Substantial evidence has been
defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant
evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.
Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and
Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact,
if supported by substantial evidence, shall be conclusive."  42 U.S.C. §§ 405(g) and 1383(c)(3).
The findings of the Commissioner are not subject to reversal merely because there exists in the
record substantial evidence to support a different conclusion.  *Buxton v. Halter,* 246 F.3d 762,
772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v.
Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also
support another conclusion, the decision of the Administrative Law Judge must stand if the
evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270,

273 (6th Cir. 1997).  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference.  *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal.  *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

### B.  Treating Physician Rule

Plaintiff argues that the ALJ did not articulate good reasons for failing to assign

controlling weight to the opinion of plaintiff's treating provider, Dr. Michael Bell, a psychiatrist. The administrative regulations implementing the Social Security Act impose standards on the weighing of medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).  In making determinations of disability, an ALJ evaluates the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013).  The so-called treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

If the ALJ does not give the opinion controlling weight, then the opinion is still entitled to significant deference or weight that takes into account the length of the treatment and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6).  The ALJ is not required to explain in detail how she considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938 ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned."). "These reasons must be supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec.

Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (July 2, 1996)) (internal

quotation marks omitted).

A failure to follow these procedural requirements "denotes a lack of substantial evidence,

even where the conclusion of the ALJ may be justified based on the record." *Rogers,* 486 F.3d at

243.  The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner

has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will

continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set

forth reasons for the weight assigned." *Cole,* 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573

F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

The ALJ's "good reasons" must be "supported by the evidence in the case record, and

must be sufficiently specific to make clear to any subsequent reviewers the weight the

adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996

WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)).  As the Sixth Circuit has noted,

> the conflicting substantial evidence must consist of more than the medical
> opinions of the nontreating and nonexamining doctors. Otherwise the treating-
> physician rule would have no practical force because the treating source's opinion
> would have controlling weight only when the other sources agreed with that
> opinion. Such a rule would turn on its head the regulation's presumption of giving
> greater weight to treating sources because the weight of such sources would hinge
> on their consistency with nontreating, nonexamining sources.

*Id*. at 377.  On the other hand, the ALJ is not obligated to provide an "exhaustive factor-by-factor

analysis."  See *Francis v. Comm'r of Soc. Sec.* 414 Fed. Appx. 802, 804 (6th Cir. 2011).

Plaintiff's treating psychiatrist, Dr. Michael Bell, submitted a letter and a medical source

statement regarding plaintiff's mental capacity.  Regarding Dr. Bell's opinion, the ALJ stated:

On June 11, 2014, Dr. Bell prepared a Medical Source Statement: Patient's

Mental Capacity.  Dr. Bell opines that the claimant has no appreciable ability to maintain concentration, persistence and pace, work with others, deal with work stress, complete a normal workweek or work day, understand, remember and carry out simple or complex instructions, behave in a sociably acceptable manner or relate predictably in social situations.  Further, she can only occasionally deal with the public, relate to co-workers, function independently and socialize.  In support of this opinion, Dr. Bell notes diagnoses of depression and panic disorder. The record indicates that Dr. Bell treated the claimant for a six-day period during an inpatient admission secondary to an episode of decompensation occasioned by the claimant discontinuing her medications for two months.  He then met with her on a limited basis on an outpatient basis.  The undersigned is not persuaded that Dr. Bell treated the claimant for a sufficient period of time to establish a longitudinal perspective on the claimant's baseline functioning as opposed to her functioning in close proximity to an episode of exacerbation occasioned by noncompliance with treatment.  In addition, it is clear from the progress notes of Dr. Bell that he is inclined to advocate on behalf of the claimant.  For these reasons, the undersigned can accord limited weight to this medical source statement.  (Tr. 24)

The ALJ has provided two distinct reasons for according only limited weight to the opinion of Dr. Bell.  The issue for the court's consideration is whether those reasons are supported by or conflict with the evidence in the record, and whether the reasons are sufficiently specific.

First, the ALJ indicated that she was not persuaded that Dr. Bell had treated plaintiff long enough to develop a longitudinal perspective on plaintiff's baseline functioning.  The ALJ stated that Dr. Bell "treated the claimant for a six-day period during an inpatient admission [and] then met with her on a limited basis on an outpatient basis."  (Tr. 24)   In drawing this conclusion, the ALJ said nothing more concerning the details of Dr. Bell's relationship with plaintiff.

Evidently, defendant was aware of the limitations of the ALJ's analysis, because defendant's brief pointed out:

The ALJ also observed the Dr. Bell treated plaintiff during her November 2013 hospitalization secondary to plaintiff discontinuing her medications (R. 24, s*ee* R. 433, 459-60, 677). . . . Dr. Bell saw [p]laintiff for pharmacologic management a total of four times (December 2013, January 2014, April 2014, June 2014) before

22

he rendered his opinion of disability (R. 773-76).  Dr. Bell even noted that [p]laintiff had only been under his care since 2013 (R. 634).

It is worth noting that only the defendant provided these references to the record; the ALJ did not.

20 C.F.R. §404.1527(c)(2) sets forth the standards for weighing opinions from treating sources:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

> Subsection (c)(2)(i) provides, in part:

> When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

> Subsection (c)(2)(ii) provides, in part

> Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.

The ALJ accorded greater weight to the opinions from two nontreating sources than to the opinions of Dr. Bell. The ALJ did not discuss the specific details of Dr. Bell's interactions with plaintiff. The ALJ made no mention of the fact that Dr. Bell was aware of and considered plaintiff's prior hospitalizations as a part of his treatment of plaintiff.  For example, Dr. Bell's

hospital-chart description plaintiff's past psychiatric history provided:

> Significant for the client having three previous inpatient hospitalizations and a previous diagnosis of major depression with psychotic features versus bipolar disorder with psychotic features. The client reports a history of overdosing on medications in the past and reports no history of abuse of drugs or alcohol.

(Tr. 459)  This statement of plaintiff's history was consistent with other evidence in the record substantiating the prior hospitalizations.  (*See* Tr. 503-530)  The ALJ did not discuss this aspect of Dr. Bell's awareness of his patient's condition and history. The ALJ seems to have simply made a simplistic, numerical analysis of how frequently he saw his patient in order to not be "persuaded" that the contact was sufficient to have obtained a longitudinal picture of her impairment.  Notably, 20 C.F.R. § 404.1527(c)(2)(ii) does not specify how many times a treating source must see a patient in order to develop "a longitudinal picture." Here, Dr. Bell saw plaintiff for at least six months. He was aware of a history going back many years before that.

In contrast, the ALJ gave "great weight" to consultative examiners Karla Voyten, Ph.D. and Ernias Seleshi, M.D., who, having only reviewed plaintiff's medical records, concluded that plaintiff retained the ability to perform certain jobs. The ALJ stated:

> The undersigned accords great weight to these opinions as they are consistent with indications in the record that the claimant exhibits suspicious behavior consistent with some paranoia and taking into account the her consistent reports of chronic pain and the effects pain can have on an individual's ability to maintain concentration, persistence, pace and appropriate interactions with others.

(Tr. 23)  Frankly, the undersigned finds the foregoing statement of the ALJ to be incomprehensible; at best the statement makes no sense. At worst, it supports claimant's arguments concerning her psychological condition.

Dr. Bell certainly had more of a longitudinal perspective than Drs. Voyten and Seleshi

who only reviewed plaintiff's records.  The ALJ has not provided a sufficient explanation for why greater weight was accorded to the consultants than to the treating source.

The ALJ also improperly limited the weight given to Dr. Bell because he was "inclined to advocate" on behalf of his patient.  While Dr. Bell's notes do state that he would support her application for disability, there is no reason to believe that he was supporting her application for any reason other than his informed opinion that her impairments greatly limited her ability to work.  Moreover, the undersigned finds inconsistency in the ALJ's analysis. On the one hand, the ALJ concluded that Dr. Bell had only a limited relationship with the plaintiff. On the other hand, she criticized Dr. Bell for being an excessive advocate.  It would seem that in order for Dr. Bell to have been an excessive cheerleader, he would have had to have established a meaningful relationship with his patient.  In other words, if one is to be an "advocate" for a patient, by definition one must have a significant relationship with the patient.  There is no substantial evidence in the record showing that Dr. Bell was unduly biased in favor of Ms. Strbac.

Finally, in discounting the weight to be given to Dr. Bell's opinion, there is no way to know whether the ALJ properly considered the elements required by 20 C.F.R. § 416.927(c)(2)-(6).  While she considered the length of treatment provided by Dr. Bell, there was no discussion of the supportability of Dr. Bell's conclusions, his specialization as a psychiatrist, or any other relevant factors. *Rogers,*486 F.3d at 242.  There was no substantial discussion of how plaintiff's back issues and irritable bowel condition impacted her mental or psychological health (other than the incomprehensible quotation set forth above).  Dr. Bell's records, on the other hand, made note of these medical problems.  The ALJ did not show great deference to Dr. Bell's opinion and her apparent failure adequately to comply with the agency's rules warrants a remand unless it was harmless error. See *Wilson,*F.3d at 545-546.

The purpose of the "good reasons" requirement is two-fold.  First, a sufficiently clear explanation, "lets the claimants understand the disposition of their cases," particularly where a claimant knows that his physician has deemed him disabled and therefore "might be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied."  *Rogers,* 486 F.3d at 242 (quoting *Wilson* 378 F.3d at 544).  Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule."  *Wilson*, 378 F.3d at 544.

As stated above, in some circumstances, an ALJ's failure to articulate "good reasons" for rejecting a treating physician opinion may be considered "harmless error."  These circumstances are present where (1) "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," (2) "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," or (3) "the Commissioner has met the goal of § 1527(d) – the provision of the procedural safeguard of reasons – even though she has not complied with the terms of the regulation.  "*Wilson,* 378 F.3d at 547.  *See also Cole,* 661 F.3d at 940.  In the last of these circumstances, the procedural protections at the heart of the rule may be met when the "supportability" of the doctor's opinion, or its consistency with other evidence in the record, is indirectly attacked via an ALJ's analysis of a physician's other opinions or his analysis of the claimant's ailments.  *See Nelson v. Comm'r of Soc. Sec.,* 195 Fed. Appx. 462, 470-471 (6th Cir. 2006); *Hall v. Comm'r of Soc. Sec.,* 148 Fed. Appx. 456, 464 (6th Cir. 2005); *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010).  "If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused."  *Friend,* 375 Fed. Appx. at 551.

26

Here, the reasons given by the ALJ to support discounting the opinion of plaintiff's treating physician are questionable at best. Moreover, there is no way to know whether she considered the factors required by 20 C.F.R. § 416.927(c)(2)-(6) including the supportability of Dr. Bell's opinion. For these reasons, the undersigned concludes that the court should find that the ALJ's failure to provide sufficiently specific "good reasons" for discounting Dr. Bell's opinion as to the limitations of Ms. Strbac was not harmless error. Even if there were good reasons to reject Dr. Bell's opinions, the ALJ failed to articulate those reasons with sufficient specificity so as to allow for meaningful review. Accordingly, the court should reject the ALJ's determination.

## VIII.  Conclusion

For the foregoing reasons, it is recommended that the final decision of the Commissioner be VACATED and that the case be REMANDED, pursuant to 42 U.S.C. § 405(g), for further proceedings consistent with this Report and Recommendation.


Dated: August 3, 2016

Thomas M. Parker
United States Magistrate Judge


### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).**